## Insurance Fee on Small Loans

BROWN, Deputy Attorney General, April 29, 1940.—
You have requested an opinion of this department as to
the legality of charges made by banks in small or personal
loan transactions of a fee for "insurance" of such loans.
The inquiry is accompanied by a copy of a "personal loan
service contract" entered into between a surety company
and banks, which have in turn contracted to use a copy-
righted plan or system, details of which will be outlined
hereinafter.

The usual charge for insurance thus obtained is $5 per
$100, and the undertaking of the surety company under
the policy is to save harmless the institution making the
loan. This system or plan is advocated as affording an
arrangement whereby banks can accept single name
paper, this in turn being helpful to borrowers, according
to the advocates of the system.

An examination of the contract mentioned above shows,
however, that the surety company receives only $2 for
each $5 so collected, the balance of $3 being retained in
the deposit account of the surety company in the lending
bank. In case of a loss the surety company is not called
upon to pay the same in the usual manner, the bank in.

such event merely deducting from the deposit account of the surety company the amount required to make up such loss. Further examination of the contract discloses that should the deposit account thus created be exhausted by the payment of losses, nevertheless the surety company would not be called upon to make any payment, its total liability being limited to the amount of this reserve-deposit.

A further limitation, of advantage to the surety company, is that when the deposit account reaches a figure which represents 10 percent of the outstanding loans, any excess above this 10 percent is paid over to the surety company and becomes the surety company's property outright.

In effect, the surety company merely lends its name to the bank in return for which the surety company receives at least two percent on the total personal loan business transacted by the bank, no liability whatsoever attaching to the surety company.

We are of opinion that this plan is not permissible.

In the case of a $300 loan, a total of $15 is collected by the bank, at least $6 of which is paid to the surety company, which in turn gives no consideration except the use of its name, the balance of $9, or possibly somewhat less than $9 in the event the reserve exceeds the 10 percent figure above mentioned, being paid into the reserve fund. The customers of the bank create this reserve.

Aside from the matter of usury, which we will dwell upon later, this is a proper place for the Secretary of Banking to act to protect the public. It happens that the legislature has passed laws regulating small loan companies and consumer discount companies, one phase of such regulation being the setting of limits to the charges which may be made on loans. The banks which may adopt this plan are banks already under the supervision of the Secretary of Banking. That official can certainly not permit such banks to do an act while operating in the "personal loan" field which would not be proper in the

case of these other lending institutions. For neither the Small Loans Act nor the Consumer Discount Company Act contemplates charges of this nature. And the limits set forth in the Consumer Discount Company Act would not permit the charging of such amounts.

It should be noted, also, that the Department of Banking maintains a rigid enforcement in the case of institutions organized under the Small Loans Act of June 17, 1915, P. L. 1012, and the Consumer Discount Company Act of April 8, 1937, P. L. 262, and if such enforcement is to continue, it is only proper, in fairness to such institutions, that vigilance be exercised in the case of other personal loan transactions, whether the other institutions making such loans are required to come within the terms of the Small Loans Act or the Consumer Discount Company Act, or not.

What actually controls, however, is that this practice is a violation of the usury law, the Act of May 28, 1858, P. L. 622, 41 PS §§3 and 4, which provides as follows:

"That the lawful rate of interest for the loan or use of money, in all cases where no express contract shall have been made for a less rate, shall be six per cent. per annum; and the first and second sections of the act passed second March, one thousand seven hundred and twenty-three, entitled 'An Act to reduce the interest of money from eight to six per cent. per annum,' be and the same is hereby repealed.

"Section 2. That when a rate of interest for the loan or use of money, exceeding that established by law, shall have been reserved or contracted for, the borrower or debtor shall not be required to pay to the creditor the excess over the legal rate; and it shall be lawful for such borrower or debtor, at his option, to retain and deduct such excess from the amount of any such debt; and in all cases where any borrower or debtor shall heretofore, or hereafter, have voluntarily paid the whole debt or sum loaned, together with interest exceeding the lawful rate,

no action to recover back any such excess shall be sustained in any court of this commonwealth, unless the same shall have been commenced within six months from and after the time of such payment: *Provided always*, That nothing in this act shall affect the holders of negotiable paper, taken *bona fide* in the usual course of business."

Under the plan, in the event the bank terminates the contract, the balance of the reserve becomes the property of the surety company.

Under these circumstances, it might be said that in no event does the bank receive any part of the five percent premium charged.

It should be borne in mind, of course, that the bank is the party which actually collects the premium from the customer. The collection of this premium increases charges to an amount in excess of six percent. If we find that the bank is receiving interest in excess of six percent merely on the grounds, however, that the bank is the party which collects from the customer, we could anticipate the contention above suggested that none of this money goes to the bank. The creation of the reserve fund, which protects the bank, is, however, something which is a benefit to the bank, and all of such reserve which is used to pay losses certainly represents money which is exacted from the customer, thus increasing the amount received by the bank to a figure in excess of six percent. In the ordinary simple interest transactions the borrower does not pay additionally any sum which goes into a reserve to meet losses. Simpson v. Penn Discount Corp. et al., 335 Pa. 172 (1939), stands for the proposition that:

"The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor: *Moll v. Lafferty*, 302 Pa. 354, 359. It is immaterial in what form or pretence the usurious interest is covered in the contract: *Earnest v.*

*Hoskins*, 100 Pa. 551, 559. As usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form, and the right to relief will not be denied because parol proof of the usurious character of the transaction contradicts a written instrument. In *Hartranft v. Uhlinger*, 115 Pa. 270, it is said (p. 273) : 'It is, indeed, wholly immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment.' "

In the case of Earnest, Admr., v. Hoskins, 100 Pa. 551, the lender of money exacted as a condition of the loan that the borrower should purchase from him a piece of land at an exorbitant price. In finding this transaction usurious, the court said, at page 559:

"It is immaterial in what form or pretense the usurious interest is covered in the contract. When a party is compelled to take goods at more than the market price in order to obtain a loan, the transaction is usurious."

Paraphrasing this, we can find that when a party is compelled to pay for a surety contract in order to obtain a loan, the transaction is usurious.

The legislature has seen fit to take out of the class of usurious transactions certain loans, as those made to a corporation (Act of April 27, 1927, P. L. 404, 41 PS §2, as amended by the Act of May 8, 1929, P. L. 1647), and small loans (Act of June 17, 1915, P. L. 1012, 7 PS §751, as amended), but we find nothing in the acts or decisions which would exempt the transaction herein described from the usury statute.

As indicated above, we feel the duty of the Secretary of Banking to protect the public furnishes compelling grounds for you to refuse to permit the use of this system by the banking institutions under your jurisdiction. Additionally, the transaction is usurious.

It is our opinion, and you are accordingly advised that:

372

Banking institutions under your jurisdiction should not be permitted to exact the five percent premium paid to surety companies, as provided in the plan or system above described, or any other similar plan or system.